### ROSENTHAL v. CANGELOSI.

### No. 1525.

Court of Appeal of Louisiana. First Circuit.

Dec. 9, 1935.

Laycock & Moyse, of Baton Rouge, for appellant.

Johnson & Kantrow, of Baton Rouge, for appellee.

LE BLANC, Judge.

The defendant appeals from a judgment against him and in favor of the plaintiff, in the lower court, for the sum of $147.60, with interest and costs. The demand is one for a commission as real estate agent in having procured a tenant for a building on Government street in the city of Baton Rouge, occupied as a drug store and residence.

Plaintiff sets out in his original petition that in August, 1924, he was employed by the defendant, under an oral agreement to find and engage a tenant for the building which he (defendant) proposed to construct on the vacant lot which he owned and which formed the southwest corner of Government and Seventeenth streets. He avers that he interested a party by the name of Pace as a prospective tenant, and, having so informed the defendant, was instructed by the latter to consult an architect for the purpose of drawing suitable plans and specifications for the building to be erected; that the defendant then fixed a rental, based on his probable investment, of $87.50 per month, which Pace found to be too high and would not agree to. He then avers that he continued his endeavors in behalf of the defendant in an effort to compromise the differences between him and Pace, and that while so engaged, defendant, without his knowledge, contacted Pace direct, and effected an agreement which resulted in the rental of the building for five years at $80 per month for the first three years, and $85 per month for the remaining two years. He alleges that his services, having been the direct and procuring cause of the consummation of the lease, he is entitled to a commission of 3 per cent. on the gross amount of the rent, which commission he figures at the amount of his demand.

In a supplemental petition, plaintiff pleads in the alternative, that in the event the court should hold that there was no express agreement whereby he was employed by the defendant as above set out, then he shows that there was an implied agreement between them to the same effect, and, as a second alternative, he pleads that should it be held that there was neither an express nor implied agreement, acting under authorization and with the defendant's knowledge and consent, he rendered valuable services for him in procuring a tenant for his property, for which services he is entitled to recover the amount prayed for by him on a quantum meruit.

The defendant answered by denying that there was any agreement between them as alleged by the plaintiff, and that what plaintiff did in regard to trying to obtain a tenant for the premises, he did on his own initiative. He avers that he told plaintiff that he would be interested in building on the property only in the event that he (plaintiff) could dispose of some $3,000 worth of stock for him, and that when plaintiff showed him plans of a building, he told him that, not having sold his stock, he was not further interested, as he did not care to borrow money to invest in the building. He avers, further, that two months after this, Pace, the prospective tenant, came personally to see him about erecting a building, and, as a result of their negotiations, he did have a building constructed, and leased the same to Pace under the terms as set forth by the plaintiff.

While it is a well-recognized principle of law that an owner cannot deprive a real estate agent or broker of his commission in a deal or transaction, by taking the matter out of his hands and dealing directly, to his advantage, with the interested party on the other end, it is equally well settled that in order for the broker to recover under such circumstances, he must show that he had an express contract with the owner, or one that can definitely be implied from the relations existing between them, and that he rendered the service under such contract.

With these principles before us, let us consider the facts as revealed by the testimony in this case, and see how they are to be applied.

Plaintiff starts out by stating that probably two years before he contacted Mr. Pace with reference to leasing the property, he had endeavored to interest the Great Atlantic & Pacific Stores in opening a store on defendant's corner lot, and had spoken

to the defendant about it. Nothing resulted from his efforts in that direction, however, as it turned out that his prospect did not like the location. We presume plaintiff testified regarding this matter to indicate some previous relation with the defendant as it had altogether nothing to do with the Pace proposition. In order to further show what' his relation with defendant as an owner was, he testified about a certain commission the latter had paid him for having bought a piece of property for him. The defendant admits having paid such commission in a transaction in which he was the purchaser, and under a specific agreement in which he had bound himself to pay it. These are the only two instances tending to show any business connection between the parties prior to the Pace transaction, and surely they are not sufficient to establish a relation from which plaintiff might have implied that he was the defendant's agent, authorized to handle any real estate deal in which he might be interested.

Coming now to the transaction with which we are here concerned, plaintiff says that in August, 1934, he met Mr. Pace, and, knowing that the lease he then had was to expire the following January, he suggested to him that he might interest Mr. Cangelosi in putting up a building on his corner lot on Government street. He says that he afterwards called on Mr. Cangelosi and asked him if he would erect the building, and that he immediately agreed to it. He then states that he told the defendant that they would first have to find out the cost of the proposed building, and he (plaintiff) suggested that they get an architect to draw up the preliminary plans. It is noted that this suggestion, according to his own testimony, came from him, and not from the defendant. Immediately after leaving Mr. Cangelosi, he went to see Mr. Charlton, an architect, and had the latter go with him to see Mr. Pace, from whom the necessary data and information was obtained to draw a plan and work out an estimate of the cost. It next appears, from his testimony, that the architect gave the estimate to Mr. Cangelosi, who, upon learning that the investment would amount to $6,000, fixed a rental price of $87.50 per month. Mr. Pace would not agree to that rental. He reported this to Mr. Cangelosi, telling him that the best he could get was $75 or $80 a month for a five-year lease, which Mr. Cangelosi found too low, considering the value of the property and the cost of the building. Plaintiff then says that he continued to work on the proposition for several weeks, but how, the record does not indicate. It was on November 1st, following, that he learned that a lease had been effected between Cangelosi and Pace, and although he saw the defendant very frequently after that, it does not appear from his testimony that he ever made a specific demand on him for the commission he now claims.

Mr. Pace was called as a witness by the plaintiff. His testimony is to the effect that Mr. Rosenthal, on hearing a conversation he was having with another party, relative to the expiration of his lease, came up to him and told him that he could find him a location near by, having in mind the defendant's vacant lot at the corner of Government and Seventeenth streets. That was the manner in which he was drawn into negotiations concerning the lease. Following this, plaintiff called on him with Mr. Charlton, the architect, to secure information regarding the plans of a building which would suit him. This was in the latter part of August or the beginning of September, 1934. He says that he understood that the plan for the building, as originally drawn, called for an expenditure of $6,000, and that he and plaintiff could not get together on the amount of the rent demanded on such an investment. He is then asked, "Did Mr. Rosenthal tell you he had dropped the matter?" and he answers, "Yes. He told me he had completely dropped the matter." He states positively that Mr. Rosenthal had definitely told him and on more than one occasion that he was "through" and it was only after that, that he (Pace) went to see Mr. Cangelosi and as a result of their conferences following this interview they came to some agreement on a lease of a building that required an outlay of some $2,000 less than the one that had originally been planned.

Mr. Charlton, the architect, also called as a witness by the plaintiff, states that the preliminary sketch was made at the request of Mr. Rosenthal. He first spoke to him on August 6 or 7, 1934, and on August 9th, he and Mr. Rosenthal went out together to see Mr. Pace about the matter. He prepared the plans according to the instructions given him, and delivered them to Mr. Cangelosi. He states definitely, however, that he had no authority from Mr. Cangelosi to prepare the plan, and although he would not say positively one way or the other, at this time, the impression he had before was that Mr. Cangelosi had never before seen him in regard to the matter.

About two weeks after he had delivered the plan to Cangelosi, he met him on the street and asked him about it, and he states that Mr. Cangelosi told him that "the thing went too high, that he couldn't do anything with it." It was about five weeks after this that Mr. Cangelosi saw him and told him that he thought that he and Pace would come to some understanding, so together they went to see Pace, and as a result of their interview the new sketch for a building at a reduced cost of some $2,000 was made. The specifications for that building were finished on October 17, 1934, and about the 1st of November the contract was let.

With the exception of the testimony of Mr. J. R. Doiron, a real estate agent of Baton Rouge, which has reference to rates and commissions usually charged in his line of business, and has no direct bearing on the transactions involved herein, the foregoing constitutes the evidence on plaintiff's side of the case.

The defendant was his only witness. His testimony is to the effect that on a certain day, as he passed by the plaintiff's office, the latter stopped him on the street and told him that he had a proposition to make to him. He at once told him that he was not after buying any more property, but it turned out that plaintiff wanted to speak to him about building a store for Pace on his vacant lot on Government street. He told him that he had no money to invest and did not want to go any more in debt. Plaintiff offered to get the money for him, but he refused to consider the matter any further. The next day, Mr. Rosenthal stopped him again and introduced the subject once more, but he again told him that he did not have any money. Plaintiff, however, persisted to the point where he said that he would have Mr. Charlton prepare a plan for a building to see how much it would cost, and that if he decided afterwards that he would not build, that it would not cost him anything. He told plaintiff that he could do what he wanted about it. A few days after, Mr. Charlton met him and told him that he had the sketch which Mr. Rosenthal had spoken to him about, and that the cost of the building would run between $6,000 and $6,500. Plaintiff then called on him again and asked him what he would do about it. He told him that the price Charlton had figured was too high, whereupon plaintiff again offered to procure money for him. His answer to that, he says, was, "Nothing doing—don't bother me about building anything." He

then told him, however, that if he could dispose of some $3,000 worth of stock which he owned, he might be interested in investing the proceeds in a building. Plaintiff was unable to sell the stock, so he finally told him to let him alone, and he did. About three weeks after, Pace came to see him and opened negotiations on his own behalf. The outcome of these negotiations was that a $3,800 building was erected by a contractor who was willing to accept terms of credit, and the lease was then entered into between him and Pace. At no time, he says, did plaintiff tell him, or suggest, that he was going to charge him a fee or commission.

There is not, after all, a great variance between the foregoing recital by the defendant and that of the plaintiff. In fact, they seem to agree, save for a few details, up to the point where the negotiations leading to the first plans for the more expensive building were dropped. Plaintiff states that after that, he continued to work on the proposition, but, as we have already remarked, he does not say in what manner. Pace, his own witness, on the other hand, says that he told him that he was definitely "through" with the deal, and had "dropped" it, and it was only after this that he personally took the matter up with defendant. Pace's testimony in this respect supports the version given by defendant that after a certain period he finally told plaintiff to let him alone, and he did, and that it was three weeks after that that Pace came to see him about the matter.

█ It seems to us that up to the time that plaintiff dropped negotiations and said that he was through, that his endeavors had been in the interest of Pace for whom he had originally set out to find a location, knowing that his current lease was to expire soon, and even if he had not dropped them, and they were taken from his hands, it was not the defendant who reopened them, but Pace himself, according to the latter's own admission. If, as a result of the matter having been taken from him and handled direct, and there was therefore a commission due him, it would appear that the party liable therefor would be Pace, and not the defendant. Whilst it may be the custom in real estate transactions that the lessor generally pays the commission, we know of no law, in the absence of an agreement between the parties, which makes him such an obligor. Certainly, in this case there was nothing in the nature of an express agreement to that effect, and nothing in the testimony from

which one could be implied. The two instances referred to at the beginning of this opinion, in one of which the plaintiff had been paid a commission under a definite agreement with the defendant, and the other, in which no deal had resulted, are not of themselves sufficient to imply authority from the defendant to the plaintiff to represent him in any real estate transaction in which he might be interested.

We find the law on this point stated in R.C.L. vol. 4, p. 299, § 43, as follows:

"As it takes two to make a bargain, a broker is not entitled to be compensated for his services unless they were rendered pursuant to the express or implied request of his employer. To warrant a recovery upon his part he must have been actually employed by the person he is seeking to hold liable, for otherwise there would be no legal basis for his claim to compensation notwithstanding the fact that a purchaser may have been found through information furnished by him. The calling of a broker is not preferred in the eyes of the law to that of other occupations, and he is no more entitled to remuneration for services voluntarily rendered without any employment, express or implied, than any other member of the community. While a contract of employment may be implied from subsequent acts of ratification on the part of the alleged principal, to warrant the inference of a previous request, the owner must say or do something tending to prove that he accepted the broker as his agent in the matter something more than merely selling to the party whom the broker, while acting as a volunteer, brought to him. * * *

"Moreover, the mere fact that a broker had previously made a sale of property and been paid a commission thereon, will not entitle him to compensation for a subsequent sale on behalf of the same vendor without request or employment. * * *"

In Louisiana, the principle is well stated in a case decided by the Orleans Court of Appeal, reported in Jonas & Co. v. Itzkovitch & Copeland, 9 Orleans App. 168. The transaction therein involved was a sale instead of a lease of real estate, but with this difference the facts bear a striking similarity to those in the one before us. Inasmuch as the demand was on a quantum meruit, the decision may be said to have special application to the second alternative plea of the plaintiff in this case which also is on a quantum meruit. Plaintiff had endeavored to introduce evidence to the effect that by custom, in certain cases, the vendor pays the broker's commission, but the evidence was held properly excluded, the court saying:

"Custom may be shown to establish the fact that the parties contracted with reference to it, but, in the nature of things, this does not obtain in a quantum meruit. Custom may modify, restrict or enlarge a contract into which it enters, but it cannot create a contract or itself give rise to an obligation. Not only is there no express contract here, but we find nothing giving rise to the theory that an implied contract is deducible from the relation between the parties. * * *

"It is settled law that before a legal charge can be made, there must be a contract of employment, either expressly made, or logically implied from the facts and that no one can claim compensation from one who did not employ him, however beneficial or valuable the services may prove to the latter. [Succession of Kernan] 105 La. [592] 604 [30 So. 239]; [Le Corgne v. Garner] 7 La.App. 148."

Governed by these principles of law, we hold that the plaintiff in this case, under the facts presented, cannot recover under any of the pleas urged by him. The district judge did not assign reasons for judgment, and we do not know on which theory he decided in favor of the plaintiff. We find ourselves constrained to disagree with him, however, in the conclusion which he reached, and must therefore reverse the judgment.

For the foregoing reasons, it is therefore ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, reversed, annulled, and set aside, and it is now ordered that there be judgment in favor of the defendant and against the plaintiff dismissing the latter's suit and rejecting his demand at his costs.