130 So.2d 732 (1961)
John R. ROLSTON d/b/a Rolston Realty Company
v.
Charles A. BUFF.
No. 5354.
Court of Appeal of Louisiana, First Circuit.
May 22, 1961.
Cole & Mengis, Baton Rouge, for appellant.
Alford & Rogers, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, HERGET, JONES and LANDRY, JJ.
ELLIS, Judge.
This suit was instituted by John R. Rolston, a duly licensed real estate broker who does business in Baton Rouge, Louisiana. The suit was brought in an effort to collect the usual real estate agent's commission of 5% of the sale price of a residence which belonged to Charles A. Buff and was located in Howell Park Subdivision.
After a trial on the merits, judgment was rendered for Charles A. Buff, the defendant, rejecting plaintiff's demands. No written reasons for judgment were given. The facts are substantially as follows:
Mr. Neal A. Dooley had been employed by plaintiff realty company, (hereinafter to be described as appellant), as an agent. Mr. Dooley had discussed the possibility of selling the house in question on many occasions with Mr. Charles A. Buff (who will hereafter be referred to as appellee.) There is an uncontradicted statement in the record that appellee did not want to give an exclusive written listing to the appellant, as appellee was a car salesman and was working on the sale of several units to another real estate man at the time, and he feared the granting of the written listing would prejudice the outcome of this sale.
Appellee admits agreeing to allow appellant to sell the property, although he also retained the right to sell it himself. He *733 even went so far as to call appellant's office to correct an error in the advertisement placed in the paper.[1] Appellant and appellee were running ads for the sale of the house simultaneously.
Appellee had agreed on setting a price of approximately $17,500 on the house, based upon a belief that the balance of the mortgage on his house was approximately $14,000. He wished cash for his equity and an assumption of the mortgage.
There is a good deal of confusion over appellee's actual expectations in the event appellee sold the property. At one point, he stated categorically that he expected to net $2,750 for his equity in the home, and that he expected the commission to be approximately $750.[2]
From this testimony and other statements made by plaintiff regarding the details of his agreement with appellant's agent,[3] it is clear that there was a binding agreement formed, although the exact terms of the agreement do not clearly appear in the record.
Furthermore, there is considerable testimony by all parties concerned regarding the occurrences surrounding the transactions at issue which indicate knowledge of appellant's efforts to sell the house and acquiescence in these efforts on the part of the appellee.
At one point in their dealings Dooley was showing the home to the ultimate purchaser, Charles Milton Lowry, when the appellee came there to get a foot locker. He talked to the agent and also met and conversed with the prospect and ultimate purchaser, Lowry. Appellant's sign was on the lawn at the time and nothing was said in regard to it, although on trial he denied having given the appellant the right to place its sign on the premises. He testified that he allowed the sign to remain because of friendship. In the meantime, appellee had discovered his mortgage balance was actually $14,325.
On June 24, 1957 Dooley obtained a written and signed offer to purchase on the basis of $3,000 cash and an assumption of the mortgage from Lowry, together with a cash deposit of $200. The offer was communicated to appellee, who rejected it. Either at this time or within a few days thereafter the appellee revoked appellant's authority to sell the house. It is felt that the exact time of this revocation is immaterial. He stated that he had a good prospect from Port Allen, Louisiana, and did not wish appellant to continue attempting to sell the house.
*734 Several days later Lowry phoned appellee, apparently in response to appellee's ad, and questioned him concerning the home for sale. The testimony of appellee and appellee's wife differs from the testimony of Lowry on the exact sequence of events which then transpired. Accepting appellee's version, Lowry asked appellee if the house he was advertising was the same one a real estate company had been handling previously and appellee answered that a real estate man had "had his finger in it but it was not for sale by him."
Lowry concluded that it was the same house he had already seen with Dooley, and then outlined his previous written offer to the realty company which was, essentially, $3,000 cash down and the assumption of the mortgage in the amount of $14,000. The same offer was accepted by appellee, except that Lowry assumed the mortgage in the correct amount of $14,325, and according to appellee and his wife, the agreement was made that night over the phone.
The next day Lowry went by appellee's place of business and gave him a deposit and appellee recognized him as the individual and prospective purchaser whom he had seen at the home with the agent, Dooley.
On July 8, 1957, which was two weeks subsequent to the date of his signed agreement to purchase which had been secured by appellant's agent, Dooley, the act of sale was passed.
Appellant's agent, Dooley, discovered the results of these later transactions in this manner. He went by the home at a later date to pick up his "for sale" sign and saw that Lowry was living in the home. He had visited in appellee's home between the date of the sale and the time he discovered what had happened but nothing was mentioned by appellee at that time regarding the transaction.
The first issue, as is pointed out by both appellant's counsel and appellee's counsel, is whether or not a contract ever existed between the parties to this law suit.
It is undisputed that appellee never gave appellant a listing on the residence in question in writing. However, it is a settled rule of law in this state that a contract to sell realty need not be in writing. The authorities on this point are numerous. Blasini v. Charbonnet, Orleans 1929, 10 La.App. 629, 121 So. 205; Turner v. Swann, 2 Cir., 1929, 11 La.App. 689, 124 So. 717; Rosenblath v. Brumfield, La.App. 1943, 15 So.2d 474; Isaac v. Dronet, La.App. 1 Cir., 1947, 31 So.2d 299; Foulks v. Richardson, La.App. 1 Cir., 1956, 87 So.2d 335; Dew v. Hunter, La.App. 2 Cir., 1953, 66 So.2d 400; J. R. Grand Agency, Inc. v. Staring, 1924, 156 La. 1094, 101 So. 723; Grace Realty Co. v. Peytavin Planting Co., 1924, 156 La. 93, 100 So. 62, 43 A.L.R. 1096.
Having recognized this point of law, we come to another question. Was there an unwritten contract under which appellant was authorized to negotiate for the sale of appellee's residence in Howell Park Subdivision? The only way in which such a contract could be proven would be by testimony and other evidence regarding any pertinent transactions which transpired between the parties. A careful review of the undisputed facts as set forth above, and the documents and advertisements in evidence has been made. The only conclusion which can be drawn from these is that such a contract was made between appellant and appellee.
The appellee denied giving appellant authority to sell his property except to one prospect whom he stated appellant had interested in the property before the authority was given. The appellee's acquiescence in the advertisement of the residence by appellant and his admission that he asked appellant to correct an error in this advertisement indicate that this was not the case. Further proof of this point is appellee's failure to make any objections to the presence of appellant's sale sign on the lawn on the date he met and talked to Lowry at the home with Dooley and his failure to object to the presence of Dooley and Lowry *735 on that date. Nor did he ever question Dooley as to whether or not Lowry was the original prospect which appellee claimed Dooley had interested in the property. Nor is it explained why advertisement, either by sign or in the paper, was necessary if a definite prospect had already been obtained by appellant prior to the time of the agreement.
Several cases were cited by appellee's counsel as authority for the proposition that there was not an existing contract in this case. Moore v. Loe, La.App. 2 Cir., 37 So.2d 345; United States Realty Sales of Shreveport v. Rhodes, La.App. 2 Cir., 34 So.2d 523; Rosenthal v. Cangelosi, La.App. 1 Cir., 164 So. 502; Monsur v. Hoornstra, La.App. 2 Cir., 95 So.2d 656; Bender v. International Paint Co., 237 La. 569, 111 So.2d 775.
In the case of Moore v. Loe, cited supra, the court stated:
"The determination of this matter rests solely upon the resolution of questions of fact as between the opposing contentions of plaintiff and defendant. The testimony of the witnesses for the respective parties, and particularly that of the principals themselves, is extremely contradictory and unsatisfactory, but careful study of the record convinces us that plaintiff has failed to make out her case by the requisite preponderance of evidence.
"There is no question as to the initial employment of plaintiff, but, in our opinion, she has failed to establish the continuance of this employment on a general and unrestricted basis to any degree which would entitle her to claim a commission on the basis of the sale finally negotiated. Plaintiff's claims, as elaborated in her testimony, are refuted not only by the testimony of defendant, but by the testimony of Mrs. Horka and Mrs. Lowe, both of whom testified plaintiff had not shown them the property nor had she even informed them as to the name of the owner. Mrs. Lowe further testified that plaintiff told her the property had been taken off the market."
* * * * * *
"The obligations of the broker in establishing his right to a commission are definitely set forth in Rosenthal v. Cangelosi, La.App., 164 So. 502, 503:
"`* * * he must show that he had an express contract with the owner, or one that can definitely be implied from the relations existing between them, and that he rendered the service under such contract.'
"In this case plaintiff has failed to show any definitely established agreement of any kind further than the original agreement under which she was authorized to exhibit the property to one prospect.
"The case of White v. Havard, La.App., 25 So.2d 108, cited in behalf of plaintiff is not analogous to the matter at hand. In the White case the facts as developed on trial definitely established an attempt on the part of the owner to defeat the broker's right to commission by engaging in direct negotiations with prospects who had been interested by the broker and by him introduced to the owner. It was some time after the initiation of negotiations that the owner attempted to take the property out of the broker's hands.
"None of these elements are established in the case before us. The burden of proof was upon plaintiff, and, in view of her failure to assume and discharge such burden, necessarily her action must fail."
In the case of United States Realty Sales of Shreveport v. Rhodes, cited supra, the defendant denied having ever had any agreement for the plaintiff to sell his property. This is corroborated by the testimony *736 of the ultimate purchaser who testified that plaintiff agreed at the time he took them to defendant's store, told them that defendant's store was not listed with plaintiff. The court held in that case that the record failed to establish that the defendant employed the plaintiff as a broker or agreed to pay a commission on the sale. Furthermore, the court found that the plaintiff was primarily representing the purchaser in the transaction and that the "agent's efforts to secure Rhodes' agreement for his firm to act as his agent were unsuccessful." [34 So.2d 523]. The distinction between this case and the case at bar is that the court found from a preponderance of the testimony that no contract of employment ever existed. This is clearly not the case presented herein.
The case of Rosenthal v. Cangelosi, cited supra, presents the following fact situation. The plaintiff had negotiated with the defendant in regard to obtaining a tenant for the building which defendant intended to construct upon his vacant lot. Pace was interested, but at the time that plaintiff was dealing with the transaction, the parties could not agree on any price. The court apparently relied heavily upon the testimony of Pace who testified on behalf of plaintiff. He stated that he had asked the plaintiff on several occasions whether he was still dealing with the defendant, and he stated positively that he was not dealing with the matter any more. At this time Pace contacted the defendant personally, the cost of the proposed building was reduced by some $2,000 and a final agreement was reached.
There are two points on which the facts of the Rosenthal case may be distinguished from the facts presented in the case at bar. The ultimate agreement was completely different from the original agreement proposed while the plaintiff was representing the defendant. Furthermore, the ultimate lessee contacted the plaintiff on several occasions and on each of these occasions was informed that plaintiff was "through with the deal and had dropped it." It was only after this assurance that the ultimate lessee made an attempt to renew negotiations with the defendant. The court stated after a review of the testimony:
"`It is settled law that before a legal charge can be made, there must be a contract of employment, either expressly made, or logically implied from the facts and that no one can claim compensation from one who did not employ him, however beneficial or valuable the services may prove to the latter. (Succession of Kernan) 105 La. (592) 604 (30 So. 239); (LeCorgne v. Garner) 7 La.App. 148.'
"Governed by these principles of law, we hold that the plaintiff in this case, under the facts presented, cannot recover under any of the pleas urged by him. The district judge did not assign reasons for judgment, and we do not know on which theory he decided in favor of the plaintiff. We find ourselves constrained to disagree with him, however, in the conclusion which he reached, and must therefore reverse the judgment." [164 So. 506]
In the case at bar the terms of the sale were substantially similar to the original offer which plaintiff obtained from the ultimate purchaser. Furthermore, the ultimate purchaser did not make any effort to contact appellant, when he discovered that appellee's house was the same house which appellant had shown him.
The case of Monsur v. Hoornstra, cited supra, was a case in which the court found that the real estate agent was actually representing the intended purchaser. Upon learning the identity of the intended purchaser, the defendant refused to sell. The defendant had refused to employ the plaintiff on the basis that any commissions would be deducted from the $5,000 which she wished to net from the property. The plaintiff, with prior knowledge that the intended purchaser wished to buy the property *737 for $5,000, had approached defendant with the offer. After her refusal, defendant went back to the intended purchaser and obtained his agreement to increase the price to $5,250 so that plaintiff could get a commission. Upon taking this offer back to the defendant and revealing the identity of the purchaser, the defendant refused to sell. We feel that the court was justified in finding that there was no actual contract in that case and that the defendant was under no obligation to pay a commission. There are other distinctions from the case at bar which it is not necessary to set forth herein.
The case of Bender v. International Paint Co., cited supra, may be distinguished from the case at bar at the very outset. In that case plaintiff admitted that he had no agreement whatsoever with either defendant as to employment or payment. He sought to recover on the basis of quantum meruit.
Appellee cited several cases as authority for the proposition that a "broker is not entitled to recover real estate commission on a quantum meruit basis where he has no agreement as to employment or payment." Granting that this proposition is correct and that the cases cited therein are correct, so far as their interpretation of the law is concerned, it is felt that since it has been found that there was an agreement of employment and an understanding concerning payment in this case, the cited cases and the above statements of the law are found to be inapposite.
Counsel for appellee relies upon the proposition that the burden of proof is on the broker to establish continuance of employment on a general and unrestricted basis which would entitle Broker to claim a commission on a sale finally negotiated. He cites as authority for this proposition the case of Moore v. Loe, cited supra, and United States Realty Sales of Shreveport v. Rhodes, cited supra, Lewis v. Manson, 132 La. 817, 61 So. 835, and Ford v. Shaffer, 143 La. 635, 79 So. 172.
The Moore v. Loe case and the United States Realty Sales of Shreveport v. Rhodes case are both distinguished supra.
The case of Lewis v. Manson, cited supra, was one in which the ultimate purchaser was not found to be the same party as plaintiff had made overtures to concerning the property. The party originally contacted by the plaintiff was acting merely as agent for the purchaser when the actual sale was made. There are other points of distinction, but it is felt that this is the most basic one.
In the case of Ford v. Shaffer, which is cited supra, the ultimate purchaser was disgusted when he went to see the property in question. The broker was unable to even obtain an offer from him, because of the poor condition of the roads in the area. Some ten months later the defendant's husband undertook to sell the property. Meanwhile the Police Jury had agreed to gravel the public roads of the parish. A sale was made to the original prospect upon the faith of the Police Jury's agreement. Thus, only after a considerable length of time had elapsed and a promise to substantially improve the nature of the property, was the sale completed. The case at bar is easily distinguishable from the Ford case and the court found, in effect, that the broker was not the procuring cause of the sale.
The appellee's counsel cites the case of Bullis & Thomas v. Calvert, 162 La. 378, 110 So. 621, as authority for the following proposition:
"Where broker has failed to effect sale, owner may take up negotiations where they left off, and himself take up sale, without becoming liable for commission, unless broker's efforts were in effect procuring cause of sale." (Emphasis ours)
The crux of the Bullis case is found in the following quotation from the opinion:
"Mr. Morgan was well acquainted with the lands long before plaintiffs *738 became connected with them. In the course of five or six years before that, he had twice sought to buy the lands, but they were not for sale. On both occasions he had employed Mounger to purchase the lands if possible; and so when Mounger, after the lands were put in his hands for sale, sought out Morgan as a possible purchaser, he was not using any information coming from plaintiffs or profiting by any efforts of plaintiffs to interest Morgan in the purchase, but was proceeding entirely on his own information and knowledge."
It was further pointed out that the defendant was not attempting to fraudulently deprive the agent of his commission, since Mounger was paid the commission on the sale price. Therefore, it is clear that the Bullis case rests upon the proposition that the broker's efforts were not found to be the procuring cause of the sale.
Without going into considerable detail, it is possible to outline several occurrences which proved that the efforts of the appellant in this case were, in effect, the procuring cause of the sale. When the ultimate purchaser ascertained, upon his first contact of appellee after revocation of the contract, that the home appellee was selling was the same home which he had been shown by appellant, he agreed to buy upon substantially similar terms. According to appellee, not even one more showing of the premises in question was needed. In addition, the ultimate purchaser was first interested in the property in question when he read appellant's ad in the paper. The subsequent transactions are proof positive of this. Although it was not known by the ultimate purchaser that he was calling the same man whom he had met with Dooley on appellee's premises regarding those same premises when he first called, this fact soon became evident to both Lowry and appellee. At this point nothing was done by either party to notify appellant concerning what had transpired. Under the facts, this court cannot but conclude that appellant's efforts on behalf of appellee were the procuring cause of the sale of appellee's home. This finding, coupled with the further conclusion that there was a binding contract between appellant and appellee under which appellant was authorized to sell appellee's home and earn the usual commission therefor, must result in a judgment for plaintiff.
For the reasons assigned, the judgment of the trial court herein is reversed and judgment is hereby rendered in favor of the appellant, John R. Rolston d/b/a Rolston Realty Company and against the appellee, Charles A. Buff, in the full sum of $866.26, together with legal interest thereon, from date of judicial demand until paid and for all costs of court.
Reversed.
NOTES
[1] "Q. When did you tell Mr. Dooley that his ad was incorrect and that the ad said Victoria Gardens? A. I don't recall the date."
[2] "XQ. But you have already stated that you expected approximately $17,500.00 for your house, how did you expect to arrive at $3,000.00 net if you only got $3,500.00 cash and still pay a commission? A. I didn't expect to net $3,000.00.

"XQ. How much did you expect to net? A. No less than $2,750.00.
"XQ. You expected then to pay approximately $750.00 commission? A. Yes, sir, considering $3,500.00 as the basis on which we were figuring.
"XQ. And you expected to net then about $2,750.00 and not $2,250.00 that Mr. Dooley informed you that you would net? A. Right."
[3] "XQ. After Mr. Cooley went to work for Mr. Rolston as a real estate agent, what did you tell him with regard to selling your property? A. He approached me a number of time to list this property and called me during the six months prior. I told him I was not going to list it with anybody, I handle no property through real estate men. He said he had a buyer for the place and from the time he left Jim August's until approximately the 20th he approached me a number of times regarding the listing and I told him my house wasn't for sale until I moved. I moved from there around the 18 or 19 of June and he came by after I moved and said could he show the place and I said I would have to have $3,500.00 for my equity and would take no less and he said wouldn't you take less, and I said `Neal, bring me a check and I will consider it.'"