521 So.2d 810 (1988)
WOODS REALTY, INC., Plaintiff-Appellant,
v.
BRIMBERRY TRUST and Ouachita National Bank, Defendants-Appellees.
No. 19391-CA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 1988.
*811 Thompson, Sparks & Dean by George B. Dean, Jr., for plaintiff-appellant.
Dean, Kneipp & Hastings by Donald L. Kneipp, for defendants-appellees.
Before HALL, JASPER E. JONES and LINDSAY, JJ.
LINDSAY, Judge.
Plaintiff, Woods Realty, Inc., appealed the trial court judgment denying recovery of a real estate commission allegedly owed to it by the defendants. For the reasons assigned below, we affirm the judgment of the trial court.

FACTS
On May 9, 1984, Earl C. Brimberry, Sr. and his wife, Madie Mills Brimberry, established the Brimberry Inter Vivos Trust, into which they placed certain real estate and stock. The original trustees were Mr. and Mr. Brimberry. Under the terms of the trust instrument, Jane Brimberry Pratt, their daughter, and the Ouachita National Bank of Monroe, Louisiana, became co-trustees of the trust following Mr. Brimberry's death later that year. Included among the trust property was the Brimberry home which is located on Pargoud Avenue overlooking Bayou DeSiard in Monroe.
In early 1985, a decision was made by the co-trustees to offer the Brimberry house for sale. After the property was appraised, the bank's trust department decided to seek a price of $310,000. The bank chose to attempt to sell the property itself without the employment of a real estate broker.
In early March of 1985, Carolyn Woods, the president and sole stockholder of Woods Realty, Inc., learned from one of her agents that the Brimberry property was going on the market and the sale was being handled by the bank's trust department. Ms. Woods called the bank and eventually spoke to Mark Bodron, the trust officer handling the Brimberry Trust. Ms. *812 Woods asked Mr. Bodron to give her agency an exclusive listing on the property. He declined because the bank wanted to sell the property on its own.
In late March, one of Ms. Woods agents wanted to show the Brimberry property to one of her buying clients, Bill Hurt. Ms. Woods called Mr. Bodron asking for permission to show the house. She did not mention the name of the client to whom the property would be shown. Mr. Bodron consented. He testified that he informed Ms. Woods that the bank wanted $310,000 for the property and that any real estate commission would have to be paid by the buyer. Apparently, Mr. Hurt did not make an offer on the property.
Later, on another occasion, one of Ms. Woods agents called Mr. Bodron to obtain permission to show the property to one of her clients, Don Anzelmo. There was no discussion as to the price, and Mr. Bodron was not told the name of the client. Mr. Anzelmo did not make an offer on the property.
However, beginning with the Hurt showing, and thereafter, Ms. Woods contended that during various telephone conversations she and Bodron agreed that she could list the property for sale. She contended that the first agreement called for her company to list the property for $325,000, with any prospective buyer being advised that Woods Realty was to receive a $15,000 real estate commission. She stated that during a subsequent telephone conversation, she and Mr. Bodron made a "subtle" change in the agreement to provide that the property could be offered at a price of $325,000, with Woods Realty receiving a 4.5 percent commission on the sale from the bank, thus effectively concealing the amount of the commission from the buyer.
On the contrary, Mr. Bodron's testimony concerning the alleged conversations differs substantially from that of Ms. Woods. He did not agree to a listing. It was his understanding that any real estate commission would be borne by the buyer, and that it would not be paid out of the bank's proceeds. He conceded that a sales price of $325,000 was mentioned, but he maintained that the bank was to receive $310,000 and the buyer was to pay any real estate commission.
On Easter Sunday, 1985, Sheila Bayles, one of Wood Realty's agents, told Bill and Carol Kight that the Brimberry property was available. About a year previously, the Kights had asked Ms. Bayles to notify them of available property on Bayou DiSiard. Mrs. Kight was particularly pleased at the prospect of purchasing the house. Concerned that the property might be purchased by someone else, Mr. Kight permitted the preparation of a purchase agreement for $325,000, subject to their inspection of the property and their attorney's approval of the offer. This offer was held in abeyance because the occupant of the house, Mrs. Brimberry, was temporarily out of town, thus preventing the Kights from touring the house.
Upon Mrs. Brimberry's return from her trip, she allowed the Kights to inspect the house. After the inspection, Mr. Kight authorized Ms. Woods to make an offer of $304,000, which included a four and one-half percent commission.
On April 17, 1985, Ms. Woods conveyed the offer of $304,000 to Mr. Bodron. This offer was not acceptable to the bank. Ms. Woods advised Mr. Bodron that he could either reject the offer or make a counter offer. Ms. Woods prepared a counter offer to reflect a price of $325,000, with the bank paying the real estate commission of four and one-half percent. When she handed it back to Mr. Bodron, he said that he thought he should let a more experienced trust officer examine the document, as this was his first real estate transaction.
Mr. Bodron first showed the document to Charles Hodgskins, who objected to the language which provided that the bank was paying the commission. Mr. Bodron returned to Ms. Woods and suggested that the language be altered to reflect that the buyer was to pay the commission. She informed him that that this was not her understanding of their agreement. This was the first time Ms. Woods had reduced her understanding of the "agreement" to writing.
*813 Mr. Bodron then conferred with Bill Staab, a senior vice president and trust officer. Mr. Bodron returned to his office and told Ms. Woods that Mr. Staab said that the document should recite that the bank was going to receive $310,000, not $325,000 with the commission coming from the proceeds of the sale.
Ms. Woods asked to speak to Mr. Staab personally. The three met in Mr. Bodron's office. Mr. Staab objected to the wording of the counter offer because Ms. Woods was representing the buyer, not the bank. Bank policy provided that if the bank listed the property with a real estate agent, it would pay the realtor's commission. However, when the bank undertook to sell the property itself, as was the case here, it would not pay any commission.
Ms. Woods testified that Mr. Staab told her that the purchase price would have to be $310,000, and that her commission would have to come from her clients, the Kights.
Mr. Bodron testified that there was some discussion about rewording the document to provide that the bank was not paying the commission, or to omit any reference to the commission.
Mrs. Woods prepared an offer for $310,000, which omitted any reference to a commission. Mr. Kight purchased the Brimberry property for $310,000. No commission was paid.
After the sale was completed, Woods Realty, Inc., made formal demand upon the Brimberry Trust, for collection of its commission. Institution of this suit followed. Suit was filed against Mrs. Pratt and the bank in their capacities as co-trustees for the Brimberry Trust, and against the bank, alleging their solidary liability for payment of the commission. The plaintiff sought $13,950, plus legal interest, reasonable attorney fees under LSA-R.S. 23:632, and costs.
The trial court found that no formal contract concerning the commission was ever consummated. It further held that Ms. Woods agreed to the final document which allowed the bank to obtain the price it sought throughout the negotiations. The trial court found that the agreement between the plaintiff and the bank required that any real estate commission would have to come from the ultimate purchaser. The trial court rendered judgment in favor of the defendants, and cast the plaintiff with costs.
The plaintiff filed this devolutive appeal. It relies upon the following assignments of error:
1. That the trial court erred in failing to find that a non-exclusive verbal brokerage agreement or engagement existed between the plaintiff and the bank and/or the trust;
2. That the trial court erred in failing to find that the terms of the broker's agreement provided for a sales price of $325,000 with a commission of four and one-half percent of such sales price payable to the plaintiff from the sales proceeds;
3. That the trial court erred in finding that the plaintiff agreed to a non-conforming sale of property at a price of $310,000;
4. That the trial court erred in finding that the plaintiff earned no commission; and
5. That the trial court erred in finding that any commission due to the plaintiff on the sale of the property would have to be paid by Mr. Kight.

EXISTENCE OF BROKERAGE AGREEMENT
All of the plaintiff's assignments of error are closely interrelated and may be discussed under a common heading. The plaintiff contends that a non-exclusive verbal brokerage agreement existed between it and the bank and the trust. Ms. Woods testified that she and Mr. Bodron entered into an "open listing" agreement. Mr. Bodron steadfastly maintained that the parties did not enter into any sort of listing agreement.
For a broker to recover a commission on the sale of property, he must prove that there was either an express or implied agreement on the part of the owner to pay a commission. Without such proof, the *814 broker cannot recover compensation for his services, although his services might have resulted in benefit to the owner. Teague v. Ashy, 278 So.2d 516 (La.App. 3rd Cir.1973); Arnold v. Louisiana Health Service and Indemnity Company, 396 So.2d 1012 (La. App. 1st Cir.1981).
A real estate broker is not entitled to payment even on a quantum merit basis when he has no express or implied contract with the party from whom he seeks a commission. Bender v. International Paint Company, 237 La. 569, 111 So.2d 775 (1959); Arnold, supra; Wagner & Truax Co., Inc. v. Barnett Enterprises, Inc., 447 So.2d 1255 (La.App. 4th Cir.1984). There must be a contract of employment, either express or implied from the facts, and no one can claim compensation from one who did not employ him, however beneficial or valuable the services may prove. Rosenthal v. Cangelosi, 164 So. 502 (La.App. 1st Cir.1935); Waggoner & Truax, supra.
A real estate broker may prove the existence of an oral listing agreement and brokerage contract. However, LSA-C.C. Art. 1846 requires that an oral contract for a price in excess of $500 be proved by at least one credible witness, and other corroborating circumstances. The testimony of the plaintiff may fulfill the requirement for at least one credible witness. The Code article's requirement for "other corroborating circumstances" means general corroboration, not independent proof of every detail of the witnesses testimony. Samuels v. Firestone Tire & Rubber Company, 342 So.2d 661 (La.1977).
The trial court concluded that the parties failed to consummate a formal agreement for the payment of a commission. Implicit in this finding is the trial court's evaluation of the credibility of the witnesses. Apparently, the trial court chose to accord greater weight and reliability to the testimony of Mr. Bodron and Mr. Staab than to that of Ms. Woods. After a review of the record, we find no manifest error in this ruling.
We note a lack of corroborating circumstances to substantiate Ms. Woods' testimony. Although she acknowledged that the changes allegedly agreed upon during the disputed telephone conversation were "subtle," she did not reduce them or the alleged listing agreement to writing, as is apparently customary. She maintained that she informed her agents of the open listing agreement and its provisions after her telephone call to Mr. Bodron. However, none of her agents testified at trial to substantiate this assertion.
The first time there was an attempt to reduce to writing the "agreement" relating to the commission was when the Kight offer was made. When an inexperienced Mr. Bodron prudently showed the counter offer prepared by Ms. Woods to senior trust officers, the full "subtlety" of the changes sought by Ms. Woods was brought to his attention.
Neither Mr. Bodron nor any other bank employee sought the assistance of a realtor in selling the Brimberry property. Instead, Ms. Woods pursued the listing and tried unsuccessfully on several occasions to prevail upon Mr. Bodron to list the property with her agency. The bank specifically desired to avoid employing a realtor and Ms. Woods knew this was the case. As noted by Mr. Staab, several real estate agencies were customers of the bank. The bank did not want to favor one real estate agency over another. Further, to allow the realtors to call and register their prospective purchasers for various pieces of property managed by the bank would necessitate the burdensome maintenance of records by the bank. The bank sought to avoid the establishment of such a registery.
Ms. Woods testified that she thought of herself as the listing agent representing the bank. However, she could not specifically recall telling the Kights that she represented the bank, and Mr. Kight testified that she never directly told him that she represented the bank. A licensed real estate agent is required to inform all of the parties for whom he acts if he is acting for more than one party in a transaction. See LSA-R.S. 37:1455(A)(19).
We agree with the trial court that the plaintiff failed to prove an oral listing *815 agreement with the bank by the terms of which the bank would pay the plaintiff's commission. The evidence fails to establish that the bank employed the plaintiff or agreed to pay its commission. There was only one agreement which existed between the parties, i.e., the realtor was allowed to show the property to her own buying clients, the bank was required to obtain $310,000 from any sale, and the realtor would be responsible for obtaining its commission from its buyer-client.
Ms. Woods brought the bank an offer of $304,000, which the bank rejected, as it was entitled to do. The bank then declined to make a counter offer of $325,000 with a 4.5 percent commission, as it was also entitled to do. In keeping with her fiduciary duties to her buying clients, Ms. Woods recounted the bank's position to Mr. Kight. However, she made no attempt to negotiate with him for her commission. When the sale was closed, Ms. Woods knew that no arrangements had been made for a real estate commission and she knew that the bank had specifically declined to be bound to pay a commission.
We find, as did the trial court, that there was no employment of the plaintiff by the bank as alleged under assignment of error number one, and no agreement by the bank to pay a commission, either expressly or by implication. Therefore, it is unnecessary to consider the closely related assignments of error number two and number three.
As to the plaintiff's entitlement to a commission as suggested in assignments of error number four and number five, we note that the plaintiff was free to negotiate a commission with her buying clients, the Kights. Under the terms of the plaintiff's agreement with the bank, Ms. Woods was to look to her own buying customers for a commission. That the plaintiff failed to obtain an agreement from her client to pay a commission is perhaps regrettable, but the loss of the commission is not attributable to the bank.

CONCLUSION
For the reasons assigned above, the judgment of the trial court is affirmed. Costs are assessed against the plaintiff-appellant.
AFFIRMED.