# STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## NO. 2022 CA 0691

## BARGES UNLIMITED INC. AND CORNELIUS J. TABOR, JR.

### VERSUS

## MORGAN CITY STEVEDORES, LLC, BABIN MARINE, LLC, ROLAND SHAPLEY AND LEE BABIN

*Judgment Rendered:* **FEB 0 2 2023**

\* \* \* \* \* \* \* \*

Appealed from the
16th Judicial District Court
In and for the Parish of St. Mary
State of Louisiana
Case No. 133,815, Division G

The Honorable Curtis Sigar, Judge Presiding

\* \* \* \* \* \* \* \*

C. E. Bourg, II
Morgan City, Louisiana

Counsel for Defendants/Plaintiffs-
in-Reconvention-Appellants
Morgan City Stevedores, LLC,
Babin Marine, LLC, Roland
Shapley, and Lee Babin

S. Patrick Skiles
Tessa L. Seitzinger
Morgan City, Louisiana

Counsel for Plaintiffs/Defendants-
in-Reconvention-Appellees Barges
Unlimited Inc. and Cornelius J.
Tabor, Jr.

\* \* \* \* \* \* \* \*

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

Hester, J. concurs

Chutz, J. concurs

**THERIOT, J.**

Defendants/plaintiffs-in-reconvention-appellants, Morgan City Stevedores, LLC ("MCS"), Babin Marine, LLC, Roland Shapley ("Shapley"), and Lee Babin ("Babin"), appeal the portions of the trial court's October 15, 2021 judgment that rendered judgment in favor of plaintiff/defendant-in-reconvention-appellee, Cornelius J. Tabor ("Tabor"), and against Shapley and Babin in the amount of $80,000.00 for conversion; rendered judgment in favor of Tabor and against Babin, Shapley, and MCS for the sum of $5,398.00 for services provided; rendered judgment in favor of Tabor and against Babin and Babin Marine for the fee of $18,000.00; and cast MCS, Babin Marine, Shapley, and Babin with 75% of the court costs. Appellants also appeal the trial court's October 18, 2021 amended judgment, which sought to amend the original judgment and to reduce the award for conversion to $40,000.00. For the following reasons, we vacate the October 18, 2021 amended judgment, reinstate the October 15, 2021 judgment, affirm the October 15, 2021 judgment in part, reverse the October 15, 2021 judgment in part, and render judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Tabor owns Barges Unlimited Inc., which rents/brokers barges and owns a set of barge ramps ("the Tabor Ramps"). In late 2017, Barges Unlimited was awarded a job to move equipment from Morgan City to Puerto Rico, after Hurricane Maria. Tabor chartered barges, placed the Tabor Ramps on those barges, and furnished binders, chains, D-rings, and clips for D-rings, which he owned. MCS, which was owned by Shapley and Babin, performed two load outs for the relief trip. Tabor, however, had to pay his own welders. When the barges returned, Babin cut everything off the two barges, including the Tabor Ramps, chains, binders, and D-rings, and invoiced Tabor for the work. The Tabor Ramps

2

were placed in Babin's yard, and the chains, binders, and D-rings were put in a shed in Babin's yard.

In connection with the two load outs, MCS prepared invoices directed to Barges Unlimited for "[l]oading and securing miscellaneous equipment for FEMA Relief per trip and tow surveyor." Invoice No. 17-12-109 ("the Disputed Invoice") was dated December 31, 2017 and originally listed the total due as $55,175.00; however, during a meeting with Tabor at Shoney's on January 17, 2018, Babin made a handwritten adjustment to the Disputed Invoice, reducing the total due to $32,150.00. Tabor later also made a handwritten notation on the Disputed Invoice, which stated "Offset trade for binders, chain & Drings per Lee." No payment was rendered on the Disputed Invoice.

During this same time frame, Next Generation Logistics, LLC ("Next Generation"), a subcontractor of MLU Services, Inc. ("MLU"), contacted Tabor for barges to bring equipment to the U.S. Virgin Islands. Tabor rented two barges from Central Boat Rentals ("Central Boat") and, in turn, rented them to Next Generation. Tabor brought the Next Generation work to MCS. MCS did two load outs for Next Generation, billing approximately $26,900.00 per barge. Additionally, Next Generation needed ramps for the barges, and Babin Marine sold ramps ("the Babin Ramps") to Next Generation for $132,000.00; Next Generation paid $55,000.00, leaving a balance of approximately $77,000.00.

Next Generation, ultimately, lost the job bringing equipment to the U.S. Virgin Islands. When they returned, Crosby Towing towed them to Houma, seizing the barges, the equipment, and the Babin Ramps. Tabor was told the barges were going to Crosby Towing's dock in Houma. Crosby Towing had six docks in Houma, which Tabor "covertly" searched. After "scouring bayous and canals" for a week, Tabor found the equipment. Central Boat contacted Crosby Towing, which removed the Babin Ramps and equipment and returned the barges

3

to Central Boat. Crosby Towing, however, claimed the Babin Ramps and equipment as payment for what Next Generation owed. Tabor contacted the Terrebonne Parish Sheriff's Office, which directed Crosby Towing to release the Babin Ramps. Babin paid Crosby Towing a $2,500.00 loading fee, and the Babin Ramps were returned.

Tabor contacted MLU and negotiated payments for himself and MCS for the amounts owed by Next Generation. Additionally, Babin forwarded invoices to Tabor, in February 2018, who in turn forwarded them to MLU; those invoices included wiring instructions for Babin Transportation. Tabor received $63,000.00 and signed a release. MCS received $4,650.75 and signed a release. Whether Babin received payment from MLU is disputed.

Thereafter, on July 13, 2018, Lee Dragna ("Dragna") contacted Tabor, inquiring if the Tabor Ramps were for sale; Tabor told him they were for sale and sent him to Babin's yard to look at them. Tabor advised Babin that he needed to get his ramps out of the yard, as Dragna wanted to purchase them; however, Babin would not let the Tabor Ramps leave the yard because money was owed to him/MCS. Dragna, ultimately, purchased two ramps from Babin, which he testified were a "much better deal."

On July 25, 2018, MCS's attorney sent correspondence to Tabor, seeking to recoup "$32,120"[1] due to MCS. The correspondence provided notice of MCS's alleged possessory rights in the Tabor Ramps, asserting they were pledged as collateral and there was a preservation of property privilege.

On August 9, 2018, Tabor sent correspondence to MCS's counsel, asserting no open invoices were owed. Tabor, however, enclosed the following three invoices, asserting they were delinquent and should be paid upon delivery to Babin and Shapley: (1) MCS 001, which was dated January 18, 2018, and directed to

---

[1] This appears to be a typographical error, in light of the amount on the Disputed Invoice.

MCS, in the total amount of $26,000.00, and described as a "Commission for Bringing Next Generation Marine Business to [MCS]" ("Commission Invoice MCS 001"); (2) BM 002, which was dated February 20, 2018, and directed to Babin Marine, in the amount of $13,200.00, and described as a "10% Brokerage/Commissin [sic] fee for two ramps sold to Next Generation Marine by Babin Marine ..." ("Commission Invoice BM 002"); and (3) BM 001, which was dated March 26, 2018, and directed to Babin Marine, in the amount of $18,000.00, and described as "Finders [sic] fee for locating ramps for Babin Marine and helping negotiate payment from MLU ..." and "Finders fee for locating Barges CBR 786 and CBR 792 at Crosbt [sic] dock in Houma, La., getting Terrebonne Parish Sheriff Detective to notify Crosby [sic] had to release barges, equipment on barges and ramps to owners and ramps that were cut off barges to Babin Marine ... and negotiated payment ... from MLU" ("Commission Invoice BM 001") (collectively "the Commission Invoices").

On September 4, 2018, MCS's counsel sent correspondence to Tabor, in part, withdrawing any previous storage fee agreements for the Tabor Ramps and advising Tabor would be charged $50.00 per day for storage.

On June 5, 2019, Tabor and Barges Unlimited filed a petition for damages, naming MCS, Babin Marine, Shapley, and Babin as defendants. They alleged causes of action for tortious interference with a contract, conversion of the Tabor Ramps, and a suit on open account, attaching the Commission Invoices totaling $57,200.00. MCS, Babin Marine, Shapley, and Babin filed an answer and reconventional demand, alleging Tabor and Barges Unlimited owed "$32,120"[2] to MCS for stevedoring services as well as storage and/or rent for the Tabor Ramps and claiming a lessor's privilege on the Tabor Ramps. Tabor and Barges Unlimited answered, denying the allegations.

---

[2] See footnote 1, supra.

5

The matter proceeded to trial on May 6 and 10, 2021. In its reasons for judgment, the trial court, in pertinent part, found Babin and Shapley converted the Tabor Ramps, noting the invoices from Babin, Shapley, and MCS were paid in full. As to Commission Invoice MCS 001, the trial court found, in this particular industry (shipping), there appeared to be an unwritten rule/custom that one is entitled to some type of finder's fee in assisting in collecting money owed or obtaining a job. The trial court found Tabor's demand was excessive and not in agreement with the customary 10% commission but awarded Tabor $5,398.00 for his assistance in helping MCS obtain a contract with Next Generation. The trial court did not award a finder's fee for Commission Invoice BM 002. However, the trial court awarded Tabor $18,000.00 for Commission Invoice BM 001, finding he was instrumental in locating the Babin Ramps and negotiating their release and payment from MLU.

On October 15, 2021, the trial court signed a judgment, decreeing that Babin and Shapley converted the Tabor ramps and ordering they pay Tabor the sum of $80,000.00. The judgment ordered Babin, Shapley, and MCS to pay Tabor $5,398.00 in connection with Commission Invoice MCS 001 and further ordered Babin and Babin Marine to pay Tabor $18,000.00 as a reasonable fee for Commission Invoice BM 001. The October 15, 2021 judgment cast 75% of the court costs against MCS, Babin Marine, Shapley, and Babin and further cast 25% of the court costs against Barges Unlimited and Tabor.

On October 18, 2021, the trial court signed an amended judgment, finding Babin and Shapley converted the Tabor ramps and ordering Babin and Shapley to pay Tabor $40,000.00. The October 18, 2021 ordered "all other terms of the ORIGINAL JUDGMENT signed on the 1st [sic] day of October, 2021 remains [sic] in place." In amended reasons for judgment, the trial court stated it had

6

erroneously valued the two ramps at $40,000.00 each for a total of $80,000.00 and sought to correct and set the value at $40,000.00 for both ramps.

MCS, Babin Marine, Babin, and Shapley appeal the October 15, 2021 judgment and the October 18, 2021 amended judgment,[3] assigning as error: (1) Babin and Shapley did not convert the two barge ramps belonging to Barges Unlimited, the value of which was never established; (2) the trial court erred by not granting the claim in reconvention of MCS against Barges Unlimited; (3) the trial court erred in granting Tabor a finder's fee for locating two barges he had under charter on which the Babin Ramps were located, as Tabor found the ramps attached to his chartered barges, which Next Generation had purchased from Babin Marine, and any finder's fee should be borne by the owners, Next Generation, if such fee is indeed justified, since Tabor was looking to stop the rent he owed to

---

[3] Appellants filed a petition for suspensive appeal of "the judgment rendered ... on the 15th day of October, 2021 and the amended judgment rendered ... on the 21st day of October, 2021," appearing to rely upon the trial court clerk's stamp as opposed to the date the judge signed the October 18, 2021 judgment. The trial court granted a suspensive appeal "from the judgments rendered in the above entitled numbered cause ...", and the notice of appeal stated an appeal was granted from the October 15, 2021 judgment and the October 18, 2021 amended judgment.

In an August 11, 2022 rule to show cause order, this court noted that the trial court signed an order, on February 24, 2022, dismissing the appeal, and this court ordered the parties to show cause by briefs why this appeal should not be dismissed. On September 29, 2022, we issued an action maintaining the appeal. In this regard, on February 24, 2022, Tabor and Barges Unlimited filed a motion to dismiss for abandonment, asserting appellants had not timely paid the required bond. The trial court signed an order, on February 24, 2022, dismissing defendants' appeal on the grounds of abandonment. However, on February 24, 2022, defendants filed a motion for extension to file their appeal bond, which was set for hearing. On May 13, 2022, following a hearing, the trial court signed a judgment, denying the motion to dismiss, denying the motion for extension, and converting the suspensive appeal to a devolutive appeal.

Where the appellant has failed to file the required bond, the suspensive appeal should be converted to a devolutive appeal, as long as the appellant has met those requirements. **Clement v. Graves,** 2004-1831, p. 6 (La. App. 1st Cir. 9/28/05), 924 So.2d 196, 200. Louisiana Code of Civil Procedure article 2088(B) further provides that "[i]n the case of a suspensive appeal, when the appeal bond is not timely filed and the suspensive appeal is thereby not perfected, the trial court maintains jurisdiction to convert the suspensive appeal to a devolutive appeal ..." Additionally, even when appellants fail to pay the estimated costs for the appeal, the trial court is required to have a hearing before dismissing the appeal. See La. Code Civ. P. art. 2126(E). Nevertheless, on February 24, 2022, the trial court, without a hearing, dismissed the appeal, although on that same day, the appellants filed a motion for extension of time to file their suspensive appeal bond and, alternatively, requested the suspensive appeal be converted to a devolutive appeal. Appellants' motion for extension was filed within the new trial delays. See **Reed v. Columbia/HCA Information Service, Inc.,** 99-1315, p. 4 (La. App. 5th Cir. 4/25/00), 761 So.2d 625, 627 ("We see no reason why a party cannot apply for new trial of a judgment dismissing an appeal."). Where appellants timely requested reconsideration, we find the trial court's May 13, 2022 judgment converted the suspensive appeal to a devolutive appeal and corrected the February 24, 2022 dismissal; thus, a devolutive appeal is properly before this court.

7

Central Boat for these very barges; (4) the trial court erred in granting judgment in favor of Tabor for $18,000.00 against Babin, personally, and his limited liability corporation, Babin Marine; (5) the trial court erred in casting 75% of costs in this matter against MCS, Babin Marine, Shapley, and Babin; and (6) the trial court erred when it ordered Babin, Shapley, and MCS to pay $5,398.00 to Tabor on "Invoice No. MCS-01," dated January 18, 2018, which was a disputed 50% commission.

## APPELLATE JURISDICTION

On August 11, 2022, this court issued a rule to show cause order, *ex proprio motu*, noting, in part, that it is unclear from the record how the October 18, 2021 judgment came to be signed and the October 18, 2021 judgment impermissibly refers to extrinsic documents. We ordered the parties to show cause by briefs why this appeal should not be dismissed. On September 29, 2022, this court issued an action, maintaining the appeal.

Nevertheless, having thoroughly reviewed the record, the jurisprudence, and the appellants' arguments, we find the trial court lacked authority to execute the October 18, 2021 judgment. La. Code Civ. P. art. 1951 provides:

> On motion of the court or any party, a final judgment may be amended at any time to alter the phraseology of the judgment or to correct deficiencies in the decretal language or errors of calculation. The judgment may be amended only after a hearing with notice to all parties, except that a hearing is not required if all parties consent or if the court or the party submitting the amended judgment certifies that it was provided to all parties at least five days before the amendment and that no opposition has been received. A final judgment may not be amended under this Article to change its substance.

A judgment may be amended by the court where the resulting judgment takes nothing from or adds nothing to the original judgment; however, an amendment to a judgment which adds to, subtracts from, or in any way affects the substance of the judgment, is considered a substantive amendment. **Benoit v. Benoit**, 2021-0864, p. 13 (La. App. 1st Cir. 4/4/22), 341 So.3d 719, 730, writ not

8

considered, 2022-00951 (La. 10/4/22), 347 So.3d 890. Substantive amendments to judgments can be made only by consent of the parties or after a party has successfully litigated a timely application for new trial, an action for nullity, or a timely appeal. **Id.** The supreme court also has recognized that the trial court may amend a judgment substantively on its own motion and with consent of the parties, but an assertion of amendment of a final judgment by consent must be supported by competent evidence. See **LaBove v. Theriot**, 597 So.2d 1007, 1010-11 (La. 1992). When the substance of a judgment has been improperly amended, the amended judgment is annulled and set aside, and the original judgment is reinstated. **Benoit**, 2021-0864, p. 13, 341 So.3d at 730.

The October 18, 2021 amended judgment changed the award of $80,000.00 for conversion to $40,000.00, which was substantive in nature. See **Locke v. Madcon Corp.**, 2021-0382, p. 5 (La. App. 1st Cir. 12/30/21), 340 So.3d 946, 950 ("A change in a judgment which alters the amount of relief that a party is entitled to receive is a substantive change. ..."). Further, it is unclear from the record how the October 18, 2021 amended judgment came to be signed. In **Locke**, it also was unclear how the amended judgment therein came to be signed, as the record did not contain a motion for new trial, a motion for nullity, or any evidence the amended judgment was signed with the parties' consent, such as signatures of the parties' respective counsel thereon; thus, the amended judgment was an absolute nullity. **Locke**, 2021-0382, pp. 5-6, 340 So.3d at 950.

As in **Locke**, the record herein does not contain a motion for new trial, a motion for nullity, or any evidence that the October 18, 2021 amended judgment was signed with the consent of the parties, such as signatures of the parties' respective counsel being included on the amended judgment. Although appellants assert in their show cause brief that both attorneys consented to the amended judgment to correct a math calculation, there is no competent evidence in the

9

record establishing consent. We, thus, vacate and set aside the October 18, 2021 amended judgment and reinstate the October 15, 2021 judgment. Although we lack jurisdiction to consider the merits of an appeal from the absolutely null October 18, 2021 amended judgment, see **Locke**, 2021-0382, p. 7, 340 So.3d at 951, we, nevertheless, maintain the appeal as to the October 15, 2021 judgment, which also was appealed by the appellants.

## DISCUSSION

### Conversion

In their first assignment of error, appellants assert Babin and Shapley did not convert the Tabor Ramps, as their value was not established and they should have been subject to a lessor's privilege for storage. The tort of conversion is grounded on the unlawful interference with the ownership or possession of a movable and is committed by any of the following actions: (1) possession is acquired in an unauthorized manner; (2) the chattel is removed from one place to another with the intent to exercise control over it; (3) possession of the chattel is transferred without authority; (4) possession is withheld from the owner or possessor; (5) the chattel is altered or destroyed; (6) the chattel is used improperly; or (7) ownership is asserted over the chattel. See **Dual Drilling Co. v. Mills Equipment Investments, Inc.**, 98-0343, p. 4 (La. 12/1/98), 721 So.2d 853, 857. Whether or not a party has committed the intentional tort of conversion is a question of fact. **Wellan v. Comfort Innovations, LLC**, 2019-0812, p. 12 (La. App. 1st Cir. 6/12/20), 305 So.3d 883, 892. The supreme court has announced a two-part test for the reversal of a factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court; and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). See **Stobart v. State through**

10

**Department of Transportation and Development,** 617 So.2d 880, 882 (La. 1993).

Barges Unlimited owns the Tabor Ramps, which were placed in Babin's yard. In his trial testimony, Shapley testified the Tabor Ramps "were in our possession," and he agreed that he instructed Babin to keep them in the yard and to not allow them to be released to Tabor. In his trial testimony, Babin agreed he and Shapley made the decision to keep the Tabor Ramps and not release them to Tabor. The trial testimony is undisputed Tabor did not pledge the ramps for work done by MCS, and we find there is no applicable privilege herein.[4] Thus, where Shapley and Babin withheld possession of the Tabor Ramps from their owner, we find a reasonable factual basis exists for the trial court's finding that Shapley and Babin converted the Tabor Ramps, and this finding was not manifestly erroneous.

As in any tort action, the plaintiff in a suit for wrongful conversion bears the burden of proving the extent of the damages he suffered. **Unique Construction Co. v. S.S. Mini Storage, Inc.,** 570 So.2d 161, 164 (La. App. 5th Cir. 1990) The traditional damages for conversion consist of the return of the property itself, or if the property cannot be returned, the value of the property at the time of the conversion. **Quealy v. Paine, Webber, Jackson & Curtis, Inc.,** 475 So.2d 756, 761 (La. 1985). Moreover, if not sold to third persons, the owner is entitled to the return of the property together with such damages as he may have sustained and can establish with that certainty required by law. See **Marcel v. Denton,** 195

---

[4] As to a claim for a lessor's privilege for past due storage, La. Civ. Code art. 2707 provides, in pertinent part, that "[t]o secure the payment of rent and other obligations arising from the lease of an immovable, the lessor has a privilege on the lessee's movables that are found in or upon the leased property." There is no evidence of a lease of an immovable herein, and we find Tabor never agreed to pay storage costs.

Additionally, "[h]e who, having in his possession the property of another, whether in deposit or on loan or otherwise, has been obliged to incur any expense for its preservation, acquires on this property two species of rights." La. Civ. Code art. 3224. "Against the owner of the thing, his right is in the nature of that of pledge, by virtue of which he may retain the thing until the expenses, which he has incurred, are repaid." La. Civ. Code art. 3225. However, Babin testified he did nothing to maintain or preserve the Tabor Ramps, since they had been in his yard, and no record evidence reflects Shapley or Babin incurred expenses for their preservation.

11

So.2d 163, 167 (La. App. 1st Cir. 1967); see also **Quealy**, 475 So.2d at 762. In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury. La. Civ. Code art. 2324.1. It is well-settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages. **Guillory v. Lee**, 2009-0075, p. 14 (La. 6/26/09), 16 So.3d 1104, 1116.

As to their claim for conversion damages, Tabor and Barges Unlimited alleged, in their petition, that they were "depriv[ed] ... of their rights to rent, lease or sell the barge ramps." They alleged they were "entitled to just compensation and all legal relief available by law," and the trial court awarded $80,000.00 in conversion damages.

However, the Tabor Ramps remain in Babin's yard and in his possession. No evidence reflects they cannot be returned; in fact, Tabor has demanded their return and contacted Dragna to make arrangements to move and store them. When asked if the Tabor Ramps were wasting away, Babin responded, "Most probably ... They needed to be sandblasted and primed." However, there is no evidence as to the amount of diminution of value, if any, or that the Tabor Ramps are now worthless. Tabor testified that Dragna made him an offer of $30,000.00 to purchase his ramps;[5] nevertheless, Dragna testified that he decided to purchase two ramps from Babin, which were a "much better deal." Tabor testified that "there were other opportunities out there probably I could have sold them or rented the ramps," after Dragna. Without offering a time frame, Tabor stated he has had potential buyers call him, and a general price range of $40,000.00 was discussed. However, we find Tabor and Barges Unlimited have not provided evidence of a $40,000 purchase offer or general damages, if any.

---

[5] Conversely, in a July 16, 2018 audio recording, addressed herein, Babin told Tabor that Dragna was going to rent the ramps, he was going to charge Dragna $36,000.00 for the year, and Dragna would purchase the ramps at the end of the year. Nevertheless, this appears speculative, as Dragna's trial testimony did not corroborate any rental agreement, especially where he stated he found a "much better deal" with Babin's ramps.

Where the record reveals the Tabor Ramps can be returned and Tabor and Barges Unlimited sought "all legal relief available by law," we find the proper remedy herein is return of the property. See e.g. **Gurst v. City of Natchitoches**, 428 So.2d 502, 505 (La. App. 3d Cir. 1983) (in a suit requesting damages for conversion, where the value of the property was speculative, the record revealed the property could be returned, which the court found was the proper remedy). We reverse the trial court's award of $80,000.00 for conversion, as it is an abuse of discretion unsupported by the record, and we order that the two barge ramps owned by Barges Unlimited be returned to Tabor, as Barges Unlimited's owner.

## Suit on Open Account for the Commission Invoices

In their third, fourth, and sixth assignments of error, appellants contend there was no agreement to pay commissions and Shapley and Babin did nothing to render themselves individually liable to Tabor or Barges Unlimited. An open account is "any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions." La. R.S. 9:2781(D). An open account necessarily involves an underlying agreement between the parties on which the debt is based.[6] **Brown v. McGinity**, 2021-1405, p. 4 (La. App. 1st Cir. 7/14/22), 347 So.3d 900, 905, writ denied, 2022-01239 (La. 11/8/22), 349 So.3d 575. In an action on an open account, a plaintiff bears the burden of proving his demand by a preponderance of the evidence and first must prove the account by showing that the record of the account was kept in the course of business and by introducing supporting testimony regarding its accuracy. **Id.** Once the plaintiff has established a *prima facie* case, the burden shifts to the debtor to prove the inaccuracy of the account or to prove that the debtor is entitled to certain credits.

---

[6] Tabor and Barge Unlimited assert that, when companies in the marine industry refer business opportunities to other business owners and when profit is actually realized, a customary percentage between 10% and 30% is paid to the referring business owner. Although custom may modify, restrict or enlarge a contract into which it enters, it cannot create a contract or itself give rise to an obligation. **Rosenthal v. Cangelosi**, 164 So. 502, 506 (La. App. 1st Cir. 1935).

**Id.** The amount due on an account is a question of fact that may not be disturbed absent manifest error. **Id.**

As to Commission Invoice MCS 001, Tabor testified that he decided to give the Next Generation work to MCS, because Babin offered him "[h]alf of whatever he charged." When asked if he had paperwork showing an agreement to pay him a fifty percent commission on stevedoring, Babin replied, "No paperwork, just hand and mouth. That's it, voice, in person." When asked about the basis for the $18,000.00 Commission Invoice BM 001, Tabor testified that "... me and Mr. Babin discussed me finding the barges and I'd get compensated for it, and once he got paid by MLU, I'd get that amount we discussed, $18,000." Thus, Tabor asserts the existence of oral contracts.

A trial court's determination of the existence or nonexistence of an oral contract is a finding of fact governed by the manifest error standard of review. **Steve Owens Construction, Inc. v. Bordelon**, 2017-1320, p. 4 (La. App. 1st Cir. 2/27/18), 243 So.3d 601, 604. When claiming the existence of an oral contract for the payment of money above $500.00 in value, as in the present case, La. Civ. Code art. 1846 requires the party to prove the existence and terms of the contract by at least one credible witness and other corroborating circumstances. **See Id.** at 605 (citing La. Civ. Code art. 1846). To meet this burden of proof, a party to the contract may be his own witness and the corroborating circumstances may be general, without independently proving every detail of the agreement; however, corroboration must come from a source other than the plaintiff. **Red Star Consultants, LLC v. Ferrara Fire Apparatus, Inc.**, 2017-0847, p. 5 (La. App. 1st Cir. 2/8/18), 242 So.3d 608, 611. Whether there is sufficient corroborating circumstances to establish an oral contract likewise is a question of fact governed by the manifest error standard of review, and when evaluating the evidence needed to establish the existence of an oral contract, the trial court is allowed to make

14

credibility determinations. See **Steve Owens Construction, Inc.**, 2017-1320, p. 5, 243 So.3d at 605; see also **King v. Belello**, 295 So.2d 514, 515 (La. App. 1st Cir. 1974) (the trial court's acceptance of the plaintiff's credibility and his version of the oral contract was not manifestly erroneous and sufficient corroboration existed to substantiate plaintiff's testimony).

We first note Tabor did not testify the alleged account herein was kept in the course of business. Furthermore, when faced with questions about why Commission Invoice BM 002 was dated and sent before Commission BM 001, Tabor replied, "No, that was a clerical error. I did that myself at home on a computer, and it wasn't a standard invoice. It was a mistake."

Nevertheless, Commission Invoice MCS 001 reflects the total sum due of $26,000.00 as a stevedoring commission for CBR 786 and CBR 792, which were each $13,000.00. As to the basis for Commission Invoice MCS 001, Tabor testified that MCS was going to charge Next Generation $26,000.00 and he "was going to get half of that on each barge, Thirteen Thousand ... each barge;" in other words, he stated "we agreed that they would be charged $26,000, and I would get half of that, of each barge, times two."

Babin, however, disputed this commission was owed, testifying, "... I didn't agree on commissions, and definitely not twenty-six ... thousand, half of what we made." Babin further stated commissions have to be agreed to before the job is undertaken, because they add it to the cost of the job. Shapley likewise denied any commission was owed to Tabor. Shapley similarly testified that, generally that commissions are written down and added "on top." As to MCS's stevedoring services for Next Generation, Shapley testified they were paid $26,900.00 for the first barge and $26,900.00 for the second barge. He stated it was a "straight number" with no commissions or anything else, and Next Generation was billed exactly what was quoted to them. Shapley stated he aims for 20-25% pre-tax

15

profit, and a commission is added on top of his fee; therefore, if someone was seeking a commission in the amount of half of what is billed/earned, the number billed would have to be doubled. Shapley further explained:

> Why would you do any business if you had to pay 50% of whatever you're doing to somebody else for a piece of business. It's not worth it. Let them take that piece of business somewhere else. ... So nobody would ever have any commission going to Mr. Tabor. I don't even know if he asked for it. I mean, I'm still confused to where he's coming from, 'cause ours was just strictly a commercial piece of business. Here's the price. Here's where it's going to go in as load, we have agreed to it, it's fine. It's done. ... You wouldn't go ahead and say well here's your number, but we've got to add another 13,000 on top of it, because we have to pay a commission. But then it would be 37,000 ... So it's crazy. I wouldn't even have fooled with it. ...

As to Commission Invoice BM 001, Tabor agreed the amount on the invoice was for both locating the ramps and negotiating payment with MLU, and he further testified it was for his expenses for a week of searching, which were not listed on the invoice. However, when asked how the $18,000.00 figure was derived, Tabor testified he could not remember, "but I know Lee and I agreed to it." In support of this claim, Tabor highlights his efforts in searching for the Babin Ramps. Emails introduced into evidence reflect that Tabor forwarded Babin's invoices to MLU as well as Babin's wiring instructions. Additionally, in an email to MLU from Tabor, copying Babin, Tabor told MLU, "We really appreciate the payments." In a text message on or around July 13, 2018, Tabor texted Babin to "[r]emember who did the leg work with TPSO to get everything off the barges and got you money from MLU." Babin responded, "I know and I remember ..." Unknown to Babin, Tabor recorded a July 16, 2018 conversation between himself and Babin. In that conversation, Tabor referenced the work he did finding the barges and making sure the Babin Ramps were taken off and getting money for Babin, which Babin agreed was done and stated "I appreciate it." Tabor testified he did everything Babin asked him to do.

16

However, Babin testified, "I didn't agree on a finder's fee ..." He further stated:

> ... he didn't give me no money from MLU. Actually, I don't know what else he did. ... there was these three fabricated invoices. Very well fabricated, and that's what we are here for today. But no, we did not talk any commissions, nowhere before, not at lunch, not in my yard, not in his truck, nowhere on the phone.

Tabor's referral of business and work done on Babin's behalf is not corroborating evidence of an agreement to pay Tabor a commission for his work, as proof of corroborating circumstances may not be the result of the plaintiff's own actions. See e.g. **Woodard v. Felts**, 573 So.2d 1312, 1315 (La. App. 2d Cir. 1991) (the plaintiff's markings on trees were not corroborating evidence of an oral agreement with the land owner to mark timber). Additionally, the Commission Invoices alone are not sufficient corroborating evidence. See e.g. **Hilliard v. Yarbrough**, 488 So.2d 1038, 1041 (La. App. 2d Cir. 1986) (despite having sent a copy of bills to defendant, plaintiff's version of the oral contract was uncorroborated as required by Article 1846). Furthermore, the emails, text messages, and the July 16, 2018 audio recording make no reference to any agreement to pay Tabor a commission; thus, they were not sufficient corroborating evidence. See e.g. **Diversified Marine Services, Inc. v. Jewel Marine, Inc.**, 2016-0617, pp. 9-10 (La. App. 1st Cir. 6/2/17), 222 So.3d 1008, 1015-16, n. 6 (plaintiff failed to offer corroborating evidence of the alleged oral contract to purchase a vessel for $150,000.00, where it produced only one e-mail from purported seller, which notably did not mention any agreement, a text message from the purported seller did not reference any specific information about proposed sale, and other emails regarding an insurance claim of the purported seller admitted the seller received an offer but did not state the offer was accepted; emails originating from the plaintiff were not sufficient corroborating evidence).

17

Considering the foregoing, we find the only evidence as to any alleged oral contract to pay Tabor commissions is Tabor's own testimony. In the absence of corroborating evidence, as required by Article 1846, we find Tabor did not meet his burden of proof of establishing an oral contract for the payment of commissions. Thus, we find a reasonable factual basis does not exist for the trial court's award of $5,398.00 to Tabor for Commission Invoice MCS 001 or the trial court's award of $18,000.00 to Tabor for Commission Invoice BM 001, and such is manifestly erroneous and reversed.[7]

## Storage Fees and the Disputed Invoice

In their second assignment of error, appellants argue the trial court erred in not granting their reconventional demand. They assert storage fees are owed, and as to the Disputed Invoice, they assert there is no initial or signature on the "offset"

---

[7] Tabor and Barges Unlimited assert that, even if the trial court had found no agreement existed, they have unjust enrichment remedies under La. Civ. Code art. 2298. "A person who has been enriched without cause at the expense of another person is bound to compensate that person. ... The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less." La. Civ. Code art. 2298. To recover under a theory of unjust enrichment, a plaintiff is required to demonstrate: (1) an enrichment to the defendant; (2) an impoverishment sustained by the plaintiff; (3) a connection between the enrichment and resulting impoverishment; (4) the absence of justification or legal cause for the enrichment and the impoverishment; and (5) the lack of any other remedy at law or lack of a contrary rule of law. **Webb v. Webb**, 2001-1577, pp. 6-7 (La. App. 1st Cir. 11/8/02), 835 So.2d 713, 718, writ denied, 2002-3001 (La. 3/14/03), 839 So.2d 37.

However, we find Tabor and Barges Unlimited have not, at minimum, established that they sustained an impoverishment and cannot recover under a theory of unjust enrichment. As to Commission Invoice MCS 001, Tabor and Barges Unlimited offered no evidence of the value of any labor and materials furnished or expense incurred, if any. Likewise, as to Commission Invoice BM 001, they offered no evidence as to the value of Tabor's time and travels to locate the Babin Ramps and secure their release, if any, or the value of his labor in emailing MLU and negotiating payment, if any. Moreover, Tabor and Barges Unlimited offered no evidence addressing what portion of Tabor's time/mileage was spent searching for the Babin Ramps as opposed to the barges Tabor leased from Central Boat. In this regard, Tabor testified:

> A: ... I did all the labor. I made about thirty ... trips, probably put five hundred ... miles on my vehicles, scouring the bayous and canals, and I found them by accident. I went to Cenac Towing Yard ... and I saw the two ramps sticking up in the air forty ... feet.
> Q: Right, because mainly you had skin in the game. You had some barges being--
> A: Yes, I did. Yes I did have skin in the game.
> Q: Because those barges, you were leasing those two barges—
> A: I was leasing the barges, and Central Boat was on my back, where are my barges? So yeah, I had skin in the game.

18

notation and Tabor abandoned the binders and chains at Babin Marine.[8] We first note that the trial court's judgment did not rule on the reconventional demand. Generally, when a trial court judgment is silent as to a claim or demand, it is presumed the relief sought was denied. **M.J. Farms, Ltd. v. Exxon Mobil Corp.,** 2007-2371, p. 12 (La. 7/1/08), 998 So.2d 16, 26, <u>amended on rehearing on other grounds</u> (Sept. 19, 2008). Accordingly, we presume the reconventional demand was denied.

We first find a refusal to award storage costs was not manifestly erroneous, where there undisputedly was no agreement to pay storage costs of the ramps and Tabor's requests to remove the Tabor Ramps were denied by Babin and Shapley. However, as to MCS's claim for the $32,150 Disputed Invoice, "[a] party who demands performance of an obligation must prove the existence of the obligation. A party who asserts that an obligation is null, or that it has been modified or extinguished, must prove the facts or acts giving rise to the nullity, modification, or extinction." La. Civ. Code art. 1831. Tabor and Barges Unlimited do not appear to dispute the work done by MCS, forming the basis for the Disputed Invoice. Although he testified that he provided various labor, Tabor admits MCS rendered stevedoring services for the load out of the barges, and MCS invoiced him for those two load outs. Tabor testified that Babin agreed to adjust the price, due to Tabor providing additional quotes and his own welders and labor. Shapley testified he was familiar with the invoices, agreeing he was the "billing guy" who issued the invoices and was responsible for accounts receivables and payables for MCS, and he agreed to the price adjustment on the bills. With the price

---

[8] Appellants further argue Babin could not legally bind MCS without Shapley's consent. However, this issue was not raised below, and appellate courts will not consider issues that were not raised in the pleadings, were not addressed by the trial court, or are raised for the first time on appeal. See **Sagona v. Sagona**, 2021-0872, p. 3 (La. App. 1st Cir. 4/8/22), 341 So.3d 839, 841. Nevertheless, Babin and Shapley admittedly were 50% owners of MCS. There is no evidence Babin lacked authority to make the exchange, and the MCS operating agreement and bylaws are not in evidence.

19

adjustment, the balance on the Disputed Invoice was \$32,150.00. Tabor testified he made no monetary payment on the Disputed Invoice.

Although not pled in their answer to the reconventional demand, Tabor and Barges Unlimited assert the Disputed Invoice was satisfied in exchange for the binders, chains, and D-rings, appearing to argue any obligation owed to MCS was extinguished through a giving in payment.[9] In this regard, a giving in payment, i.e., a *dation en paiement,* is a contract whereby an obligor gives a thing to the obligee, who accepts it in payment of a debt. See La. Civ. Code art. 2655. The critical consideration in determining whether a transaction is a giving in payment is the intent of the parties, particularly of the creditor, who has the right to demand exactly what was due by virtue of the obligation. La. Civ. Code art. 2655, Comment (b). All of the elements necessary to perfect a valid sale—that is, agreement as to the thing and the price—are essential to the perfection of a giving in payment; however, delivery of the thing also is essential to the perfection of a giving in payment. See La. Civ. Code art. 2655, Comment (c); see also La. Civ. Code arts. 2656 and 2659. A valid giving in payment presupposes the existence of a real indebtedness, and any debt or obligation, disputed or undisputed, liquidated

_____

[9] Extinguishment of an obligation in any manner is an affirmative defense. **Florida Gas Transmission Co., LLC v. Texas Brine Co., LLC,** 2022-0004, p. 9 (La. App. 1st Cir. 8/3/22), 348 So.3d 93, 100, writ denied, 2022-01344 (La. 12/20/22). Louisiana law mandates that a defendant assert its affirmative defenses in its answer. **Amedee v. Aimbridge Hospitality LLC,** 2021-01906, p. 17 (La. 10/21/22), 351 So.3d 321, 332. The requirement of affirmatively pleading extinguishment of a debt or any other matter constituting an affirmative defense has for its purpose the giving of fair notice of the nature of the defense and preventing surprise. **Budget Plan of Baton Rouge, Inc. v. Talbert,** 276 So.2d 297, 301 (La. 1973). The failure to set forth affirmative defenses waives those defenses and bars the introduction of evidence offered in connection with an affirmative defense. **Amedee,** 2021-01906 at p. 17, 351 So.3d at 333. This general rule is subject to the caveat that, where the plaintiff does not object to the introduction of such evidence, the evidence is admissible. **Id.** at n.17 (citing **Dupont v. Hebert,** 2006-2334, p. 8 (La. App. 1st Cir. 2/20/08), 984 So.2d 800, 807 ("the general rule is that pleadings may be enlarged by evidence adduced without objection when such evidence is not pertinent to any other issue raised by the pleadings and hence would have been excluded if objected to timely.")).

We note that Tabor and Barges Unlimited, in their pre-trial memorandum, asserted the remaining balance on the Disputed Invoice was "offset" due to a trade of ramp binders, chain, and d-rings. Additionally, Tabor's testimony regarding the alleged extinguishment of the remaining obligation on the Disputed Invoice was offered at trial, without objection, and this testimony was not relevant to any other issue raised by the pleadings. Thus, we find this evidence enlarged Tabor's and Barges Unlimited's answer to the reconventional demand to include the defense of extinguishment of the obligation claimed in the reconventional demand.

or unliquidated, may be extinguished by a giving in payment. See La. Civ. Code art. 2655, Comments (d) and (f).

Unilateral delivery of property by the debtor to his creditor will not perfect a *dation*. **Echo, Inc. v. Power Equipment Distributors, Inc.**, 96-1771, p. 19 (La. App. 1st Cir. 8/7/98), 719 So.2d 79, 93, n. 8, writ denied, 98-2392 (La. 11/20/98), 729 So.2d 555. A giving in payment requires mutual consent of the parties to the agreement, and the burden of showing that consent is on the debtor. See **Hancock v. Bridges**, 547 So.2d 1103, 1105 (La. App. 1st Cir. 1989), writ denied, 552 So.2d 383 (La. 1989). Absent proof of mutual agreement for the giving and acceptance of the alternative performance as full payment of the original debt, there is no *dation en paiement*. **Id.** The manifest error standard of review is applied when reviewing a trial court's determination as to whether a debtor has met their burden of proving a *dation en paiement*. See **Valiente Enterprises, Inc. v. Slay**, 580 So.2d 457, 460 (La. App. 5th Cir. 1991), writ denied, 584 So.2d 1163 (La. 1991)

In the case of movables, verbal *dation* may be made provided its testimonial proof is made in accordance with the rules on obligations provided in Civil Code. See **Mack Trucks, Inc. v. Magee**, 141 So.2d 85, 87 (La. App. 1st Cir. 1962). Although it has been held that Article 1846 (formerly La. Civ Code. art. 2277) does not apply where it is sought to establish a defense to a claim and not to prove a claim, it has likewise been held that the policy established by this codal article requires a careful scrutiny of the testimony. See **Id.** In **Mack Trucks, Inc.**, 141 So.2d at 87, this court found that, where the only evidence in support of defendant's plea of a giving in payment is his own uncorroborated testimony, which is equivocal, self-contradictory and indefinite, it can hardly be considered proof. See also **Autovest, L.L.C. v. Nash**, 50,725, p. 10 (La. App. 2d Cir. 6/22/16), 197 So.3d 258, 264-65, writ denied, 2016-1644 (La. 11/18/16), 210 So.3d 292 (affirming granting of creditor's motion for summary judgment as to the

defendant-borrower's claim to a verbal agreement for a giving in payment, where referencing the requirements of Article 1846, the court noted the defendant had not produced evidence by an agent of the plaintiff that admitted their contract was modified pursuant to a valid oral agreement for giving in payment; instead, the defendant relied on her own self-serving allegation).

After a thorough review of the record, we find it is devoid of evidence of mutual consent of both Tabor and MCS to establish a giving in payment of the chains, binders, and D-rings to satisfy the obligation owed to MCS as set forth in the Disputed Invoice. Tabor further addressed his own handwritten notation on the bottom of the Disputed Invoice as follows:

Q: And on the bottom of that invoice, there is a notation which says, "offset trade from binders, chain, and D-rings per Lee".
A. Correct.
Q: Who wrote that? Whose handwriting was that?
A: That's my handwriting.
Q: Tell us about this exchange, this offset for the D-rings, binders and chains.
A: Well when the barges, both barges came back early February, Mr. Babin cut off everything off the two barges, charged me Eighty-Eight Hundred ... Dollars on one barge, and Eight-Five ..., I think, on the second barge, and I asked him, I said what about, you know, the charges that we can offset for the binders and the labor? And he said that was fine.
Q: Okay, so that agreement was made about a month later, you said?
A: Correct.
Q: All right. So just so the Court will understand ... your barges went to Puerto Rico?
A: Correct.

...

Q: Those barges came back from Puerto Rico?
A: Correct.
Q: Your equipment was on those barges, including your D-rings, binders, and chains?
A: Correct.

...

Q: That equipment was removed from the barges?
A: Correct.
Q: And, at that point in time, that's maybe late February of 2018?
A: No, it was the first week or two in February.
Q: Okay. And you are telling me that that's when you guys reached the agreement to do the exchange?
A: Correct.
Q: And that invoice would be satisfied?
A: Correct.

Per this testimony, when the barges returned from Puerto Rico, Babin "cut everything off the two barges" and charged Tabor $8,800.00 for one barge and $8,500 for the second barge, and Tabor "asked him [Babin], I said what about, you know, the charges that we can offset for the binders and the labor? And he said that was fine." However, this testimony does not definitively establish the purported "offset" was for the Disputed Invoice; rather, it could be construed to reflect Tabor intended to direct an alleged giving in payment to the Babin Marine invoices for $8,500.00 and $8,800.00, respectively.

However, even if we were to assume that the purported "offset" was directed to the Disputed Invoice, as Tabor paid the two Babin Marine invoices in full, we still find Babin has not met his burden of proving mutual consent that the chains, binders, and D-rings would be given in payment for satisfaction of the Disputed Invoice. In **Twin City Savings, FSA v. G.J. Rouse Company, Inc.**, 595 So.2d 323, 324-25 (La. App. 1st Cir. 1991), writ denied, 600 So.2d 610 (La. 1992), for instance, this court noted that, where a *dation* must be tendered by the debtor and accepted by the creditor to be effective, the defendant-debtor's claims lacked merit, because the alleged *dation en paiement* executed by the defendant-debtor admittedly was never signed by a representative of plaintiff-creditor. In the present case, Tabor himself made a handwritten notation on the Disputed Invoice, which stated, "Offset trade for binders, chain & Drings per Lee," and admittedly did not include the initials or signature of Babin or Shapley. When asked why he did not have anyone initial or sign the notation, Tabor responded, "I don't have an answer for that other than we were all done at the – like the same thing we did at Shoney's. Nobody initialed and signed the cutting of the price, but it was agreed to that it was done by Mr. Babin." However, as outlined above, Babin admittedly handwrote the price adjustment himself on the Disputed Invoice, and there is no explanation as to

23

why he would not also have handwritten the "offset" notation or, at least, initialed it.

When asked if he accepted the chains, binders, and D-rings in an exchange, Babin replied, "Wrong." Additionally, when asked if there ever was a conversation between him and Tabor concerning an exchange of the chains, binders, and D-rings, he stated, "Never, never." According to Babin, "[t]here was no exchange," and he never received an invoice marked paid or satisfied from Barges Unlimited, indicating it had been satisfied due to the gift of the binders. Shapley testified he was not privy to discussions about an exchange of equipment and did not know anything about an alleged trade of binders, chains, and D-rings for the remaining balance on the outstanding invoice; the only information he got was that the Tabor rigging was being left on the property.

In this regard, Babin testified his crew unloaded the binders, chains, and D-rings, and they were placed on the ground. Babin agreed the chains, binders, and D-rings remained in his yard. He explained that Tabor told him:

> ... to take them out there and put them in the shed. He didn't want them. He had a bunch in his shop. He had no way to store them in his shop, and he had no one to move them to his shop. So we took them out of the grass. It was in the bill. We moved them to my shed and that's where they still sit at today.

Nothing reflects Babin has sold or otherwise removed the chains, binders, and D-rings from the property; instead, Babin charged Tabor to move them to the shed, where they remain, and stated, "If he wants them back, he can have them." Contra **Huval Tractor, Inc. v. Journet**, 452 So.2d 373, 376 (La. App. 3d Cir. 1984), writ denied, 458 So.2d 120 (La. 1984) (plaintiff manifested willingness to receive the mortgaged tractor by keeping it at its place of business and later selling it to someone else, which was sufficient to constitute a *dation en paiement*).

Babin further noted the chains, binders, and D-rings were not in good condition. When asked if he could have used the equipment to help with securing

24

of equipment on barges in stevedoring operations, Babin responded, "No, sir. We would have not." The chains, binders, and D-rings at issue are 3/8 inch, and Babin explained, "We use half inch in everything we do. We didn't use cheap three eights inch." While Babin stated two to four binders were used to load a truck, he clarified, "... I didn't use them; one of my guys went and got it and I brought it – made him being it back. So I didn't use them personally." When asked if he did anything to preserve or maintain the chains, binders, or D-rings, Babin stated, "They were not mine, so I didn't – it wasn't mine to worry about."

Tabor testified he believed he did not owe the Disputed Invoice, as he was not contacted about it again until the ramp dispute and Babin did not bring it up or dispute the exchange. As to why new invoices were not re-submitted, Babin testified they knew Tabor was going through hard times as they all were, they were working together, and Tabor knew he owed the money. Moreover, Babin stated the invoice did not have to be re-issued as it was an open account. When asked why the Disputed Invoice was not re-issued, Shapley likewise testified it was an "open invoice," and "[y]ou don't usually do that."

In the July 16, 2018 audio recording, Tabor told Babin, "I gave you the binders." However, in the audio recording, Babin did not verify any satisfaction of the Disputed Invoice through a giving of the binders; instead, he maintained the debt to MCS was owed. In this regard, this court, in **Hancock**, 547 So.2d at 1105, set aside the judgment of trial court and found there was no mutual consent that the plaintiff-creditor would accept the immovable conveyance as full and final payment of the debt, where, among other circumstances, correspondence from the plaintiff's counsel indicated his intention to sue on the note and did not reference accepting the deed as payment of the debt.

Additionally, Tabor introduced no evidence as to the value or price of the chains, binders, and D-rings, although agreement as to the thing and the price are

essential to a *dation en paiement*. See La. Civ. Code art. 2655, Comment (c). Babin's testimony, on the other hand, reflects the chains and binders are not worth anywhere near $32,000.00, and there was "no way" Tabor paid anywhere near $32,000.00 for them; moreover, they depreciate a lot. In **Valiente Enterprises, Inc.**, 580 So.2d at 460, for example, there was no error in the trial judge's apparent conclusion that the circumstances, under which the plaintiff-lessor took over a hardware store and began operating it on the leased premises, did not imply mutual consent to a *dation*, as the hardware store was worth much less when the plaintiff got it back.

Considering the foregoing, we find the sole evidence of any alleged giving in payment herein is Tabor's own uncorroborated and indefinite testimony, and the record does not provide sufficient evidence of the requisite mutual consent or an agreement as to price to establish a giving in payment of the chains, binders, and D-rings in exchange for satisfaction and extinguishment of the obligation owed to MCS as set forth in the Dispute Invoice. Where Tabor did not meet his burden of proving a giving in payment herein, we find a reasonable factual basis does not exist for the trial court's finding that no invoices are owed to MCS, which is manifestly erroneous. Where MCS has proven the existence of the obligation, we grant its reconventional demand, in part, and order Barges Unlimited to pay MCS the sum of $32,150.00 for Invoice No. 17-12-109.

**Court Costs**

As to appellants' fifth assignment of error, contesting their allocation of 75% of the court costs, the trial court, pursuant to La. Code Civ. P. art. 1920, may render judgment for costs against any party as it may consider equitable, and its assessment may only be reversed by the appellate court upon a showing of abuse of the trial court's sound discretion. See **Belanger v. Spencer H. Calahan, L.L.C.**, 2020-0763, p. 16 (La. App. 1st Cir. 4/16/21), 324 So.3d 152, 164, writ

26

denied, 2021-00828 (La. 10/5/21), 325 So.3d 377. Although we reverse portions of the October 15, 2021 judgment, we cannot say the trial court's allocation of court costs herein was an abuse of discretion, as it found Babin and Shapley converted the Tabor Ramps. We affirm this finding.

## CONCLUSION

For the foregoing reasons, we set aside and vacate the trial court's October 18, 2021 judgment and reinstate the trial court's October 15, 2021 judgment. We hereby affirm those portions of the trial court's October 15, 2021 judgment finding Lee Babin and Roland Shapley converted two barge ramps belonging to Cornelius Tabor and casting Morgan City Stevedores, LLC, Babin Marine, LLC, Roland Shapley, and Lee Babin with 75% of the court costs and casting Barges Unlimited, Inc. and Cornelius J. Tabor, Jr. with 25% of the court costs. We hereby reverse those portions of the trial court's October 15, 2021 judgment awarding Cornelius J. Tabor $80,000.00 for conversion, $5,398.00 in connection with services included on Invoice No. MCS 001, and $18,000.00 as a reasonable fee in connection with Invoice No. BM 001. Judgment is rendered ordering that the two barge ramps owned by Barges Unlimited, Inc. be returned to Cornelius J. Tabor, as owner of Barges Unlimited, Inc., granting, in part, the reconventional demand of Morgan City Stevedores, LLC, and awarding judgment in favor of Morgan City Stevedores, LLC and against Barges Unlimited, Inc. in the sum of $32,150.00 for Invoice No. 17-12-109. Costs of this appeal are assessed equally to defendants/plaintiffs-in-reconvention-appellants, Morgan City Stevedores, LLC, Babin Marine, LLC, Roland Shapley, and Lee Babin, and to plaintiffs/defendants-in-reconvention-appellees, Cornelius J. Tabor and Barges Unlimited, Inc.

**OCTOBER 18, 2021 JUDGMENT VACATED; OCTOBER 15, 2021 JUDGMENT REINSTATED; AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**